Filed 7/21/26  P. v. Randle CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MARK ANTHONY RANDLE, JR.,<br><br>        Defendant and Appellant. | A172507<br><br>(Solano County<br>Super. Ct. No. F23-01356) |

A jury convicted Mark Anthony Randle, Jr., of first degree murder (Pen. Code, § 187, subd. (a); all further undesignated statutory references are to this code) for killing his girlfriend, Erica Brown.  Randle was sentenced to 25 years to life in prison.

On appeal, Randle avers the trial court prejudicially erred by denying his motion for mistrial based on testimony by his ex-wife that he had threatened to kill her as this testimony was given in violation of an in limine ruling.  We conclude the court did not err in denying the mistrial motion, and even assuming it did, there is no reasonable probability of a different outcome but for his ex-wife's improper testimony.

Randle also raises a challenge to the jury instructions and a related claim of prosecutorial misconduct.  We find the jury instructions did not

1

affect Randle's substantial rights and the related prosecutorial misconduct claim is forfeited and, in any event, unavailing.

Accordingly, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Unless otherwise indicated, all dates refer to 2023.

*General Background*

Brown died on the night of August 20 or early morning of August 21.

At that time, Randle and Brown had been dating on and off for four or five years. They lived together in Brown's house for most of that time, first as friends and later as romantic partners.

Home surveillance footage showed Brown walking into the house at around 6:45 p.m. on August 20; Randle was already in the house. Later that night, Randle removed Brown's body from the house with the help of his mistress, Jan Elizabeth Agacinski, who went to Brown's house twice over the course of the night.

On August 25, Randle went to see his friend, Muriel Hughes. Randle told Hughes that he and Brown argued, Brown was dead, and his friend, "Jan," helped him dispose of Brown's body. He told Hughes no one would find where he put Brown. In fact, Brown's body was never recovered.

In October, an information was filed charging Randle with Brown's murder (§ 187, subd. (a)) and charging Agacinski as an accessory after the fact (§ 32).

Randle's jury trial took place in July 2024. The prosecution's theory of the case was that Randle committed premeditated, deliberate murder by beating and waterboarding Brown after confronting her about her infidelity. Agacinski, who was offered leniency to testify against Randle, provided the only witness testimony regarding the events of the night of Brown's death.

The defense theory was that Randle did not kill Brown. Rather, Brown accidentally overdosed on fentanyl on the night of her death, and Randle—fearful of being blamed with her death given his history of domestic violence—disposed of her body with Agacinski's help. The defense alternatively suggested that, if the jury believed Randle killed Brown, it was done in a heat of passion during a fight and was therefore only voluntary manslaughter. Randle did not testify.

Relevant to this appeal, the trial court issued a pretrial ruling permitting Randle's ex-wife, Danyelle Long,[1] to testify as to a 2012 domestic violence incident that occurred in their bedroom, but excluding testimony that Randle threatened to kill her in the course of that incident. After Long stated at trial that Randle threatened to kill her, Randle moved for a mistrial, which the court denied.

The following is a summary of the pertinent trial evidence.

*Prosecution Case*

*Agacinski's Testimony*

At Randle's request, Agacinski went to Brown's house twice on the night of Brown's death, first late in the night on August 20 and second in the early morning of August 21.

  *First Trip on August 20*

Around 10:30 or 11:00 p.m. on August 20, Agacinski received a call from Randle from a phone number she did not recognize. Randle told her he and Brown had gotten into a fight and asked Agacinski to come to Brown's

---

[1] In pretrial proceedings, Long was also referred to as "Danielle Randle/Hodges." We refer to her by the name and spelling she provided at trial.

house.  Agacinski got a ride from her mom, who stayed in the car with Agacinski's son while she went inside the house.

Randle, appearing distraught and worried, answered the door and led Agacinski to Brown's bedroom.  Brown was lying face down on the bed, not moving, on top of blankets and covered in another blanket.  The bed was a mess, with the corner lifted off the bed frame and pillows thrown everywhere.  Agacinski approached Brown's body to check her neck for a pulse; she felt a "very faint" pulse, and Brown let out a "little mo[a]n" and "twitched a little bit."

Agacinski said to Randle, " 'What the fuck.' "  Randle responded, vacillating between crying and calm: " 'How could she make me do this?  This is her fault. . . .  She did this.' "  When Agacinski asked what happened, Randle said he and Brown fought after he confronted her about his belief that Brown was cheating on him while he was previously in jail.

Randle told Agacinski he had "water boarded" Brown in the ensuite bathroom for about an hour.  Agacinski looked inside the bathroom and saw the showerhead ripped off the wall, towels on the floor, and shampoo bottles thrown everywhere.  Randle again "broke down" and said, " 'Why would she make me do this?  How could she do this?  Look what she made me do.' "

At some point, Randle flipped Brown's body over and Agacinski saw she was naked.  Brown's eyes were closed, her cheeks swollen, and her lip was "busted to the point that you could see all the way up to her nasal area."  She looked like she had been hit in the face.  Agacinski recalled telling the detective who interviewed her that Randle said: "We got into it.  I beat her ass.  I kept asking her, and she kept saying that she loved me."  When Agacinski proposed calling the police, leaving Brown's body, and running,

Randle said " 'fuck no.' " Agacinski told him she had to leave but agreed to Randle's request to take a suitcase of his clothing with her.

Agacinski was at Brown's house for approximately 30 to 40 minutes.

*Second Trip on August 21*

Agacinski received a phone call from Randle from the same number at around 12:30 or 1:00 a.m. on August 21. Randle was calm and told Agacinski he needed help getting one of his cars started (she had seen Randle driving three different cars: a gray or blue Chevy Malibu, a silver Mercedes, and a black Mercedes). She made the 20-minute walk from her home to Brown's house and found him standing out front trying to get his black Mercedes to start.

They sat in the car and smoked a cigarette for about ten minutes, during which time Randle calmly told Agacinski that Brown was dead. Randle said he had dragged Brown's body outside, but he got tired. Agacinski approached the Malibu, which was also parked out front, and saw something in the back seat wrapped in a blanket and blinds. It was the same blanket Agacinski had seen covering Brown in the bed.

At Randle's urging, Agacinski helped move a blue bin[2] that was stuck in the rear passenger side of the Malibu, then sat down in the front passenger seat. Randle was standing over the blanket- and blind-wrapped item, and Agacinski heard him making grunting and pushing noises and felt the Malibu moving. Eventually the grunting and pushing stopped and Randle closed the car door; Agacinski looked toward the back seat and saw Brown's head move forward and hit the headrest of the seat, but otherwise Brown did not move at all. She could tell it was Brown's head because she recognized

---

[2] The blue bin was also referred to as a "tote" in trial testimony.

Brown's hair bun from earlier in the night, and she identified the hair in the surveillance video as being Brown's hair.

Randle sat in the driver's seat of the Malibu, told Agacinski he needed to clean up blood in the driveway, and then exited the car to do so. Randle got back in the car and asked Agacinski if she wanted to go with him, presumably to dispose of Brown's body. Agacinski declined and Randle dropped her off at her home. She gave him a kiss when she exited the car: "[I]f I kept him calm, that he wouldn't want to add another body to his collection."

At no point, that day or later, did Randle mention to Agacinski anything about drug use by Brown or anyone else.

The jury was shown video footage from Brown's neighbor's surveillance camera. At circa 1:00 a.m. on August 21, it showed a silver Mercedes in the driveway with a blue bin next to it; the Malibu backed out of the driveway, turned around, and backed into the driveway with the front of the car facing the street. This was how Agacinski found the house when she arrived. Another video at around 2:15 a.m. showed Agacinski moving the blue bin from the Malibu while Randle helped.

*Post-August 21 Events*

Agacinski next heard from Randle a couple of days later when he called from another phone number she had not seen before. He asked for money to get from Richmond back home, and she sent him $20. Randle then called Agacinski on August 24, from yet another unknown number, asking for a ride to his car in Vallejo. As Agacinski did not drive, she asked her mother to drive; they picked Randle up from a convenience store and took him to his black Mercedes at a mechanic's shop in Vallejo. He could not get his car

6

started and borrowed money from Agacinski's mom, then they left him there as her mom had an appointment.

Following the events of August 21, Agacinski made a series of three Tik Tok videos on the topic of Brown's murder in which she lip-synced to various audios, including one in which she appeared to be in a courtroom being sentenced for murder. She could not explain why she made the videos, other than having a dark sense of humor, but she regretted doing so and believed it was a bad decision.

Agacinski was arrested by the Fairfield Police Department on August 29. She was interviewed by Detective Sean Spillner and initially was not completely truthful out of fear of the consequences, but she eventually told him the truth as she felt tired of carrying the secrets and wanted to come clean. She told him about the Malibu, the black Mercedes, and the blue bin, even though she was not yet aware of the video surveillance footage. And, while not completely truthful at first, Agacinski told Spillner that Randle said he had waterboarded and beat Brown and he suspected she was cheating on him, months before being offered the leniency agreement.

*Hughes's Testimony*

*Direct Examination*

Hughes had known Randle for about eight years and considered him to be one of her best friends. Randle showed up at her home in Benicia on August 25 and stayed with him for two days, until August 27. When Randle arrived, he told Hughes, " 'I have to talk to you. It's bad. . . . It's really bad.' " Two other people who were in her bedroom left the room, leaving her alone with Randle to talk.

Randle told Hughes that he and Brown got into a fight at Brown's house. Brown admitted to sending people after him, and in response, "he

7

snapped." When Hughes was asked whether Randle explained what he meant by "snapped," she said he told her it meant "he killed [Brown]." "He said they were arguing, and he asked [Brown] if she was sending people out to kill him. She said yes, and he grabbed her and said to her give me three or four reasons of why I shouldn't kill you right now. And then she said her daughter's name, and he said that wasn't good enough," Hughes recalled. Randle showed her how he grabbed Brown, which Hughes recreated in court by grabbing in front of her. Randle then told Hughes that Brown was dead.

Randle also told Hughes he called a friend of his named Jan, who helped him dispose of Brown's body, and that he burned a car he was driving. Hughes did not know who "Jan" was and had never heard of Jan Agacinski. Randle told Hughes that "they would never find [Brown] where he put her. They would never find her." Randle never mentioned Brown using drugs or drugs being involved in the incident in any way.

Randle stayed at Hughes's house for two days, mostly sleeping, until Hughes saw a missing person photo of Brown on social media and "realized that it was real." She told Randle to leave and never saw him again.

Hughes realized she was being followed by police and called the Fairfield Police Department on September 1 to let them know Randle had come to her house. Hughes met with Detective Spillner and Detective Matthew Loewe on September 5 and provided all the information she had.

*Cross-examination*

On cross-examination, Hughes was presented with prior partially inconsistent statements. For example, when asked if Hughes told a defense investigator on November 6 that Randle told her, "I hurt [Brown]" (rather than killed Brown), Hughes did not recall using those words. Hughes also

8

told the investigator that Randle said Brown was dead, but not that he had killed her.

The defense played videos of Hughes talking with Spillner and Loewe on September 5. In the videos, Hughes stated Randle did not specifically tell her what he did to Brown. Upon questioning by the defense, Hughes clarified Randle did not say he had "grabbed" Brown.

The defense also sought to clarify Hughes's testimony that Randle asked Brown to give "three or four reasons of why I shouldn't kill you right now. And then she said her daughter's name, and he said that wasn't good enough." In one of the videos from September 5, Hughes told the detectives Randle asked Brown: " 'Tell me why I shouldn't do this to you,' " to which Brown responded with her daughter's name, and Randle replied that was not good enough. In another video taken about 12 minutes later, Hughes said Randle told her he said to Brown, " 'Give me four reasons why I shouldn't do this to you,' " to which Brown replied with one reason, which was not good enough.

When asked by the defense to explain the discrepancy with her trial testimony that Randle asked for three or four reasons not to "kill" Brown, Hughes acknowledged she did not say "kill" in either video, stating: "I may not have said those exact words, but it was quite clear what he had said to me. [¶] . . . I can't necessarily remember, you know, at that moment I said kill or this or that. But I do remember the number of times that he asked this young lady. This was three or four times, and he did ask her tell me why I should not kill you."

*Redirect Examination*

On redirect, as to whether Randle asked for four reasons "not to do this" or four reasons "not to kill you," Hughes further explained: "I can't

9

remember [the] exact one, but what I remember in my head is[,] you give me four reasons why I shouldn't kill you now because he was livid that he felt that she . . . was going to kill him."

*Alicia Moore's Testimony*

Alicia Moore was Brown's best friend and coworker who had lived in Brown's house between 2017 and 2021.  Moore and Brown were together at Moore's daughter's house between 6:00 p.m. and 7:00 p.m. on the day of her death (August 20).  Brown had swelling and cuts or gashes on both her bottom lip and nose, as well as dried blood where the cuts were; these were not present the day before when they saw each other.  Brown was upset and jittery, and Moore could tell she had been crying as her eyes were still wet.  That was the last time Moore saw or heard from Brown.

When Brown did not show up for work on August 21 and did not return any of Moore's calls or messages, Moore went to Brown's house and entered through the patio door.  Brown was not home.  Her bedroom looked different from the clean state Moore had observed when she was last there two or three days before.  The bedroom was messy, the mattress was pulled away off the bed, the bed covers and curtains were missing, and Brown's purse that she wore almost every day was on the floor.  Moore told her boss (who was also Brown's boss) what she had seen, and they called the police the following day.

In the past, Moore and Brown had smoked methamphetamine together and generally only used drugs around each other or a couple of other friends. However, Moore had stopped using drugs, and she had not seen Brown use drugs for about a year before her death.  Brown did not appear under the influence of any type of drug when they saw each other on August 20.

10

*Long's Testimony*

Long, Randle's ex-wife, was with Randle from 2007 to 2014. Long was asked about a 2012 domestic violence incident. Long stated she and Randle were arguing in the bedroom and she called him a name. In response, Randle headbutted her and broke her nose, causing her to fall backwards into a laundry basket and resulting in black eyes. She repeatedly tried to get back up, but he would punch or keep her back down. Randle stood between Long and the door and did not let her leave the bedroom for over two hours.

The prosecution asked Long if anything else happened during those two hours, to which she responded: "He beat me, punched me, choked me, told me he was going to kill me." The defense objected to Long's response. The trial court struck the response and instructed the jury not to consider it.

Long then continued with her testimony regarding the incident, explaining that Randle punched her, choked her, kicked her, held her down, pulled her hair out, and held her by the throat for a long time before she was able to get away.

The defense did not cross-examine Long.

*Detective Spillner's Testimony*

Spillner was the lead detective on Brown's case. He stated a burnt Chevy Malibu was found in Richmond and the black Mercedes associated with Randle was found in Vallejo with empty gas cans in the trunk. Also, a blue tote or bin was found in Rio Vista.

Spillner helped identify Agacinski as the person in the neighbor's surveillance footage, and he interviewed her after she was arrested on August 29. Agacinski was not truthful at first, but she provided more information in subsequent interviews. Much of what Agacinski ultimately told Spillner was consistent with her trial testimony as described above.

After Randle was arrested on September 14, Spillner interviewed him with another detective.  When asked where Brown was, Randle told them she was probably out there with some man.  Randle said he argued with Brown on August 20 about infidelity and initially told the detectives Brown left out the back of the house.  Randle later changed his story—he said he did not see her leave but assumed she did because the back door was open and she was not home after he left and returned in his black Mercedes.  Randle told the detectives he packed up his belongings after he returned home and invited Agacinski over.  He then said he went to Richmond and Vallejo in the Malibu. Randle did not say Brown overdosed on August 20

At the conclusion of the interview, Spillner told Randle he was being arrested for homicide and torture, to which he responded, " 'How can you book for me [*sic*] homicide when there isn't a body.' "  A video recording of Randle's interview with Spillner was played for the jury.

*Expert Evidence Testimony*

Loewe testified as an expert in cell phone data analysis and stated that, on August 20 and 21, one of Brown's phone numbers "pinged"—providing some information as to where the phone was located—in Fairfield, then in the Vacaville area, and ultimately in the Vallejo area on August 21.  Another witness testified there was blood found on the doorjamb and latch of the rear door of the Malibu, on the same side that Agacinski said Randle put Brown's body on August 21.  A swab from that area of the Malibu was sent to a lab for testing.  Based on a DNA sample provided by Brown's mother, a DNA testing expert testified that DNA on the swab taken from the Malibu was 316 million times more likely to be a child of Brown's mother than anyone else.

12

*Defense Case*

The defense case largely centered around casting doubt upon the credibility of the prosecution witnesses, principally through cross-examination, and presenting the case that Brown overdosed on the night of her death.

*Cade Beckwith's Testimony*

Cade Beckwith, a police officer with the City of Fairfield, testified regarding the symptoms of fentanyl or heroin use and overdose. He stated someone under the influence of such drugs usually appears tired or unconscious, has heavy eyelids, almost looks to be falling asleep, and has slow movement. Symptoms of fentanyl overdose usually include a loss or near loss of consciousness, agonal breathing (no breathing for a period followed by a sudden attempt at breathing), and potentially a lowered heart rate.

On August 24, Beckwith performed a welfare check at Brown's house. When checking inside, Beckwith saw a clear plastic bag in the kitchen and believed it contained cocaine, but stated it also could have been heroin, "a real fine form of meth," or fentanyl.

*Loewe's Testimony*

The defense recalled Loewe to testify regarding his interactions with Hughes. On September 1, Loewe received a call from Hughes. Hughes told him Randle was at her house for two days, but also said Randle had not said anything about his involvement with Brown's disappearance.

Hughes called Loewe again on September 5 and scheduled a follow-up interview with him and Spillner outside of the police department, which was captured on video (portions of which were played for the jury, as described above). In that interview, Hughes said Randle told her Brown was dead.

13

Hughes also mentioned a woman named Jan who helped dispose of Brown's body. She further stated that Randle described a burnt car in Richmond, information that had not been publicly released at the time.

*John Miles's Testimony*

Defense investigator John Miles testified he interviewed Hughes at her home on November 6. According to Miles's report, Hughes told him Randle's specific words were " 'I hurt [Brown].' "

Upon questioning by the prosecution, Miles stated Hughes also told him that Randle said Brown was dead. As set forth in his written report, Hughes told him Randle described being in Brown's face and telling her " 'give me three or four reasons I shouldn't kill you.' " Hughes also said Randle told her that Brown gave her daughter as a reason, and Randle said that was not good enough.

*Closing Arguments*

*Prosecution*

The prosecution argued Randle was guilty of first degree murder based primarily on the testimonies of Agacinski and Hughes. It asserted the evidence showed express malice (intent to kill) based on Agacinski's testimony that Randle beat and waterboarded Brown and Hughes's statement that Randle told Brown to tell him four reasons not to kill her.

The prosecution further contended the evidence demonstrated implied malice: "He chose to intentionally water board her and beat her, and you saw the action that Muriel Hughes demonstrated what he did. And so those are obvious acts that are dangerous to human life, right? Everybody knows when you beat people and then you water board them that is dangerous to human life. Yes, he knew they were dangerous. Who wouldn't know they were dangerous? I don't have to prove manner of death. I have to prove he did an

14

act that caused her death. Manner of death[']s a combination of everything he did: Beat her, water board, possibly choking her. All of that contributed to her death. [¶] . . . But for beating and water boarding she would not be dead."

Also, Randle's actions after Brown's death—removing her body from the house, getting rid of the bedding, cleaning the floor, burning the Malibu, and abandoning his Mercedes—were evidence of Randle's consciousness of guilt. The prosecution noted neither Agacinski nor Hughes testified that Randle said anything about Brown overdosing, undercutting Randle's defense.

The prosecution summarized its argument: "He water boarded [Brown] for over an hour, and he beat her. This was a helpless wom[a]n saying her daughter's name, begging for her life. And he thought about it first before he did it. . . . He was over her asking her, his face close to her. 'Tell me four reasons.' He wanted to see if she gave him a reason to make her change his mind. The daughter was not a good enough reason. He thought about it, weighed it, killed her anyways. That is first degree murder."

*Defense*

The defense argument rested on the assertion that Randle did not kill Brown, kill her with malice aforethought, or commit any act that caused her to die; rather, Brown died from an accidental fentanyl overdose. The defense theory was as follows.

Randle "lost his temper and punched [Brown] in the mouth" when they fought about infidelity on August 20, based on Moore's testimony about seeing Brown earlier that day. When Brown got home after seeing Moore, Randle was packing his bags. Brown then used drugs that she did not know

15

contained fentanyl and overdosed, and Randle thought Brown simply passed out on the bed from methamphetamine use.

Randle called Agacinski when his Mercedes did not start and asked her to pick him up. Agacinski came to the house and saw Brown passed out, but they both thought she was just sleeping. Agacinski took Randle's suitcase and went home.

Agacinski returned after Randle called her a couple of hours later to help him move out. At that point, it was clear Brown had died. Randle panicked due to his history of domestic violence and so he did not call the police. Instead, he made a mistake and loaded Brown's body in the car before hiding it.

The defense asserted Agacinski and Hughes both lied, first to police and then during trial. It argued Agacinski's waterboarding claim was false and uncorroborated by other evidence, and in any event waterboarding was an interrogation technique, not a way to kill someone. Also, there were numerous inconsistencies in Agacinski's original statements to police and her trial testimony, including saying Randle told her he beat Brown, which the defense asserted resulted from an effort to avoid prison time.

The defense also highlighted the inconsistencies in Hughes's telling of what words Randle used when explaining what happened during the argument with Brown. At points, Hughes said Randle told her that he hurt Brown and that she was dead, but did not say he killed her. The defense argued Hughes's first telling of Randle's words—"tell me why I shouldn't do this to you"—could be "anything," such as asking for a reason "to not punch [Brown]." It was not until Hughes spoke with Miles in November that she said Randle used the words, "give me four reasons not to kill you."

16

The defense argued Hughes's inconsistencies undercut the evidence of first degree murder: "The only evidence of . . . premeditation or deliberation again is the one sentence from Muriel Hughes that says give me four reasons not to kill you, right? That's their entire case for premeditation and deliberation is that statement, and that statement did not happen. Again, look at Muriel Hughes' videos from the first time she said it. She said give me a reason not to do this. She didn't say kill. You can't assume from give me a reason not to do this he was thinking of killing her, he was planning on killing her, evaluating whether or not he should kill her."

The defense further contended there was no evidence of express or implied malice aforethought as Randle's action of punching Brown in the mouth did not show an intent to kill or conscious disregard of a high risk of death.

The only time the defense raised an alternative theory that Randle killed Brown in a heat of passion was toward the end of its argument, during which it still maintained Randle did not kill Brown: "There is a heat of passion defense to murder, right? So if you decide and again I don't think you can because I don't think there is any act that has been shown that [Randle] killed [Brown], if you decided there was a murder, an act that caused death and malice aforethought, you then have to decide if it was done with heat of passion. So this is why it says a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone and because of a sudden quarrel or heat of passion."

The defense went on to define heat of passion and asserted "[a]ll the evidence points to rashness, intense emotion obscured reasoning and judgment," which was "the classic scenario of heat of passion" based on Randle's finding out Brown cheated and had people follow him to try to kill

17

him.  The defense reiterated, however, the heat of passion issue was dependent on a finding that Randle murdered Brown, which the defense did not believe the jury could find, arguing, "[N]o act has been shown that caused Erica Brown to die.  This is only if you did."

*Rebuttal*

In the prosecution's rebuttal argument, it contended the attempt to bring up heat of passion was illogical given the defense almost exclusively centered on claiming Randle did not kill Brown and that she instead overdosed: "You can't have it both ways.  It can't be she overdosed but if I killed her, I did it in the heat of passion.  If I killed her, I didn't have intent.  But I didn't do anything.  She really overdosed.  Can't have it both ways."

*Verdict and Sentencing*

The jury found Randle guilty of first degree murder.

On December 13, 2024, the court sentenced Randle to 25 years to life in prison.  Randle appealed.

## DISCUSSION

Randle argues the court prejudicially erred by denying his mistrial motion based on Long's testimony at trial that he threatened to kill her.  Second, he asserts the jury instructions failed to ensure the jury found beyond a reasonable doubt he did not kill Brown in the heat of passion to convict him of murder.  Finally, he raises a related claim of prosecutorial misconduct.  We affirm.

## I. The Court Did Not Err, Prejudicially or Otherwise, by Denying Randle's Motion for a Mistrial

Randle contends the court erred by denying his mistrial motion based on Long's testimony and that the error was not harmless, asserting that, without Long's testimony that he threatened to kill her, there is a reasonable

18

probability he would have been convicted of only heat of passion voluntary manslaughter, or acquitted outright. We conclude no error is apparent and any error by the trial court in denying the mistrial motion was not prejudicial.

## A. Additional Relevant Background

### 1. In Limine Proceedings

In pretrial motions, the prosecution requested an order permitting the introduction of 10 prior acts of domestic violence by Randle under Evidence Code section 1109. The prosecution argued the prior acts showed Randle had the propensity to commit the instant offense as they involved him repeatedly arguing with intimate partners, often with accusations of infidelity, and inflicting physical harm upon them. Three of the incidents involved Randle's ex-wife, Long.

Randle sought to exclude the prior domestic violence evidence. Randle argued the incidents involving Long were outside the 10-year time span set forth in subdivision (e) of Evidence Code section 1109, had no probative value and significant prejudicial effect, and would cause an undue consumption of time.

On July 9, 2024, the court held a hearing on motions in limine. The court tentatively allowed the prosecution to introduce two of Randle's certified convictions for domestic violence from 2017 and 2018.

As to the incidents involving Long, the court held an Evidence Code section 402 hearing on July 12. Long testified regarding two domestic violence incidents in 2010 and 2012 in which Randle physically harmed her and threatened to kill her—one that took place in a truck and one that took place in their home. Long further testified as to a third incident, also in 2012, in which Randle headbutted her, broke her nose, kept her in the

19

bedroom for two hours, punched her, shoved her, and choked her multiple times (the bedroom incident).

The prosecution sought to admit her testimony but, when asked where the "[Evidence Code section] 352 line" was, the prosecution submitted it was consistent with *People v. Diaz* (2015) 60 Cal.4th 1176 to allow Long to "testify to the action committed against her but not get into the threats or specific statements that Mr. Randle made," including saying that he was going to kill Long.

In the court's ruling on the admissibility of the prior domestic violence acts, it permitted certified convictions to be introduced as the probative value outweighed the prejudicial effect, but excluded any evidence regarding domestic violence prior to 2010 as there were enough instances of conduct that occurred since then.

The court also permitted some, but not all, of Long's testimony to be presented at trial. Specifically, the court excluded testimony about the truck incident as it was dissimilar to the instant conduct and was prejudicial. However, the court allowed Long to testify as to the two incidents with Randle that took place in their home, including the bedroom incident. The court limited that testimony as follows: "I'm going to disallow questions about whether or not he threatened [Long] not because I think it's prejudicial just because I think it could lead to opening the door on some of these other things I ordered excluded." In sum, the court allowed Long to testify about the "physical acts of violence" in the residences, and though the court thought "the threats themselves are very probative," it feared they "will open the door to some of the other things [the court] excluded."

### 2. Long's Testimony

As previously noted, Long described the bedroom incident in her trial testimony, stating Randle broke her nose, caused her to have black eyes, held her down, and kept her in the bedroom for over two hours. The testimony continued as follows.

[Prosecutor:] During those two hours did anything else happen?

[Long:] He beat me, punched me, choked me, told me he was going to kill me.

[Defense Counsel]: Objection.

THE COURT: I'll strike the last answer. Ladies and gentlemen, I'm going to strike the last answer for legal reasons. You're not to consider it.

[Prosecutor:] Ms. Long, I want to know about what are the physical things that happened while you were in that room.

[Long:] He punched me, choked me, held me by my throat for a long time, kicked me. I can't remember if that's the incident that he bit me or not. Pulled my hair out.

[Defense Counsel]: Strike the last portion.

THE COURT: Yeah. I'll strike the last answer.

[Long:] Pulled my hair out, held me down, held me down for a really long time.

### 3. Mistrial Motion and Ruling

Based on Long's testimony that Randle threatened to kill her, the defense moved for a mistrial on the following day of trial: "I realize my objection was sustained, and it was stricken from the record. But the jury still heard [Long] say that Mr. Randle threatened to kill her. That was explicitly ordered to be not testified to by the Court. I know we talked about

this at great length in the in limines and multiple times during the course of trial. I'm asking for a mistrial based on that."

The trial court denied the mistrial motion, finding Long's testimony about the threat to kill her did not violate Randle's rights. The court reiterated that it found the testimony regarding the threat to Long to be "frankly probative and not really prejudicial because . . . the intent would be admissible under [Evidence Code sections] 1109, 1101[, subdivision] (b)," but it had excluded that testimony "in abundance of caution" out of fear that "if it did come up, it would lead us down the road to other things that might be prejudicial."

## B. Applicable Legal Principles

A trial court should grant a mistrial when it is apprised of prejudice that cannot be cured by admonition or instruction; in other words, " ' "only when ' "a party's chances of receiving a fair trial have been irreparably damaged." ' " ' " (*People v. Demolle* (2026) 19 Cal.5th 1117, 1152.) In some cases, volunteered testimony can result in incurable prejudice. (*People v. Harris* (2013) 57 Cal.4th 804, 848.)

However, " '[j]uries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment . . . .' " (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1428–1429; accord, *People v. Navarrete* (2010) 181 Cal.App.4th 828, 836 [a court "can almost always cure the prejudice of an improperly volunteered statement by granting a motion to strike" and giving curative instruction].)

Particularly where there is no evidence of bad faith in soliciting or proffering improper evidence, a jury is presumed to have followed an admonition to disregard such evidence. (*People v. Allen* (1978) 77 Cal.App.3d

22

924, 934–935.) "It is only in the exceptional case that 'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.' " (*Id.* at p. 935.)

We review a ruling on a motion for a mistrial based on the admission of prohibited testimony for abuse of discretion. (*People v. Harris, supra,* 57 Cal.4th at p. 848.) The erroneous denial of a mistrial motion is subject to harmless error review and is prejudicial only if it is reasonably probable that, but for the admission of the material upon which the motion was based, the defendant would have obtained a more favorable outcome. (See *People v. Welch* (1999) 20 Cal.4th 701, 749–750 [*People v. Watson* (1956) 46 Cal.2d 818 harmless error standard applies to the denial of motion for a mistrial based on erroneous admission of evidence].)[3]

"California law defines murder as 'the unlawful killing of a human being, or a fetus, with malice aforethought.' (§ 187, subd. (a).) Malice may be express or implied. (§ 188.) Express malice is an intent to kill, while implied malice is shown by a willful act with natural and probable consequences that are dangerous to human life, where the actor knowingly acts with conscious disregard for the danger to life that is inherent in the act. [Citation.] A killing with express malice that is willful, deliberate and premeditated is first degree murder. [Citation.] Second degree murder is an unlawful killing with malice aforethought, but without the elements of willfulness, premeditation

---

[3] As the California Supreme Court has applied the *Watson* harmless error standard in this context, we reject Randle's assertion, unsupported by any authority, that the *Chapman v. California* (1967) 386 U.S. 18 standard instead applies.

23

or deliberation that would support a first degree murder." (*People v. Thomas* (2013) 218 Cal.App.4th 630, 642 (*Thomas*).)

Heat of passion, which reduces unlawful killing from murder to manslaughter, " 'arises if, " 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' " ' " (*Thomas*, *supra*, 218 Cal.App.4th at p. 642.)

### C. Analysis

The trial court here does not appear to have erred. As the testimony was fleeting and the jury immediately admonished, this is not the "exceptional case" requiring the finding of a mistrial. (*People v. Allen, supra,* 77 Cal.App.3d at p. 935.)

Even if it were error to have not granted the mistrial, we are not persuaded by Randle's argument that it is reasonably probable he would not have been convicted of murder without Long's testimony, which he premises on his assertion that the other trial evidence, in particular the inculpatory testimonies of Agacinski and Hughes, "le[ft] open the distinct possibility" that he committed only heat of passion voluntary manslaughter. Randle suggests, for example, the evidence that he told Agacinski he "beat [Brown's] ass" after they got into an argument and told Hughes he "snapped" could support a finding that he killed Brown in a heat of passion rather than in a deliberate, premeditated manner. He further contends that, without Long's stricken testimony, the only evidence of intent to kill or premeditation came from Agacinski and Hughes.

We find there is no reasonable probability Randle would have been convicted of voluntary manslaughter but for Long's volunteered statement

24

that Randle threatened to kill her during the bedroom incident. (See *People v. Welch*, *supra*, 20 Cal.4th at pp. 749–750.) Randle contends that, without Long's stricken testimony, the "only evidence of intent to kill or premeditation" came from Agacinski and Hughes. This contention grossly underestimates the significance of the testimonies of Agacinski and Hughes—which exclusively supported the prosecution's theory of first degree murder—and overstates the effect of the brief and isolated remark by Long followed by the court's instruction to disregard it. (See *People v. Burgener* (2003) 29 Cal.4th 833, 875 [brief and isolated reference to uncharged crimes, followed by admonition not to consider it for any reason, did not irreparably damage defendant's chances of fair trial].)

In particular, Hughes's testimony that Randle told her days after Brown's death that he killed Brown—after asking Brown for three or four reasons not to kill her and stating her daughter was not a good enough reason—provided far stronger evidence of Randle's premeditated and deliberate intent to kill Brown than Long's brief testimony about a threat to kill her over a decade prior.

As in the trial court, Randle disputes Agacinski's and Hughes's credibility, and makes much of the different forms taken by Hughes's retelling of Randle's words to Brown over time, starting with "tell me why I shouldn't do this to you." However, it is the exclusive province of the jury to determine witness credibility and resolve conflicts and inconsistencies in trial testimony. (*People v. Oyler* (2025) 17 Cal.5th 756, 826, fn. 39, 827.) Viewed next to Hughes's testimony, the effect of Long's volunteered statement was harmless as a jury that credited Hughes's trial testimony that Randle told her he killed Brown after asking her why he should not do so "would have had no need to rely on [Long's] isolated remark"; but if the jury did not

25

otherwise credit Hughes's testimony, it would not have been persuaded by Long's brief reference to the threat. (See *People v. Burgener*, *supra*, 29 Cal.4th at pp. 875–876.)

In addition, and critical to our finding of harmlessness, Long's stricken testimony did not deprive Randle of his only—or even his primary—defense. (Cf. *People v. Roof* (1963) 216 Cal.App.2d 222, 224–227 [defendant in grand theft case deprived of fair trial, despite ample evidence of guilt, by witness testimony that defendant stated he had been charged with contributing to the delinquency of minor, as the objectionable testimony deprived defendant of his only available defense that he had not acted with fraudulent intent and was presumed to be of good character].) Randle's chief defense was that he did not kill Brown or have any involvement in her death, but rather, she died of a fentanyl overdose. By denying having any part in Brown's death—even when briefly alternatively arguing in closing that if he killed her, it was in a heat of passion—Randle was counting on the jury entirely disbelieving Hughes and Agacinski and instead crediting his version of events. The jury clearly declined to do so, and the record supports the conclusion that the same outcome would have resulted even without Long's improper testimony.

Given the strength of, and credit given to, Hughes's and Agacinski's testimonies, and Randle's choice of available defenses, there is not a reasonable probability that, without Long's stricken statement, he would have been convicted of voluntary manslaughter. For similar reasons, we readily reject Randle's suggestion that it is reasonably probable the jury would have acquitted him of all charges without Long's testimony. In sum, Randle has neither shown that the court erred in denying the mistrial motion nor that he was prejudiced by the denial.

## II. Claims of Jury Instruction Error and Prosecutorial Misconduct Are Unavailing

Randle raises related claims of jury instruction error and prosecutorial misconduct based on his assertion that the jury instructions, coupled with statements by the prosecutor in closing argument, failed to apprise the jury it was required to find the absence of heat of passion to convict him of murder.

"When a jury must consider both murder and voluntary manslaughter, heat of passion is not an element of voluntary manslaughter; rather, the absence of heat of passion is an element of murder the prosecution must prove beyond a reasonable doubt." (*People v. Najera* (2006) 138 Cal.App.4th 212, 227; accord, *Thomas*, *supra*, 218 Cal.App.4th at pp. 642–643, citing *People v. Rios* (2000) 23 Cal.4th 450, 462.) This is because heat of passion is a mental state that precludes the formation of malice, and a person who kills without malice is not guilty of murder. (*Thomas*, at p. 642.)

As an initial matter, although Randle only briefly and alternatively argued in his closing argument that, if he killed Brown, it was in a heat of passion, we accept the parties' baseline agreement that heat of passion was " 'properly presented' " in this case such that the prosecution was required to prove its absence to convict him of murder. (*People v. Rios*, *supra*, 23 Cal.4th at p. 462.) However, for the reasons we explain, we conclude Randle's claims of jury instruction error and prosecutorial misconduct are unavailing.

### A. Additional Relevant Background

#### 1. Pertinent Jury Instructions

As relevant here, the trial court instructed the jury with CALCRIM No. 520 ("First or Second Degree Murder with Malice Aforethought"), CALCRIM No. 521 ("First Degree Murder"), CALCRIM No. 522

("Provocation: Effect on Murder"), and CALCRIM No. 570 ("Voluntary Manslaughter: Heat of Passion—Lesser Included Offense").

CALCRIM No. 520 states, in pertinent part: "To prove that the defendant is guilty of [murder], the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] 2. When the defendant acted, he had a state of mind called malice aforethought"; and "3. He killed without lawful excuse or justification." The instruction went on to define "malice aforethought" and to state that, if the jury decided Randle committed murder, it is second degree murder unless the People have proved first degree murder as defined in CALCRIM No. 521 (which in turn defined acting willfully, deliberately, and with premeditation).

CALCRIM No. 522 states: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

CALCRIM No. 570 provides that "[a] killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion," which occurred if: "1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment"; and "3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

28

CALCRIM No. 570 further explains the concepts underlying heat of passion and provocation, and—crucially for our purposes—ended: "The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

The trial court read aloud each of the above instructions (in that order) before closing arguments and jury deliberation, including expressly stating as part of CALCRIM No. 570: "The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty. I'll reread that last paragraph. The people have the burden of proving beyond a reasonable doubt the defendant did not kill as a result of a sudden quarrel or heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

The court also instructed the jury: "If you believe the attorneys' comments on the law conflict with my instructions, you must follow my instructions. Pay careful attention to all instructions and consider them together." The court added, "Nothing the attorneys say is evidence. In their opening statements and closing arguments the attorneys discuss the case, but their remarks are not evidence."

Further, the court instructed: "[Y]ou'll be given verdict forms for guilty of murder, manslaughter and involuntary manslaughter. You may consider these different types of homicide whatever order you wish. I can accept a verdict of guilty of a lesser crime only if you found the defendant not guilty of the greater crime."

## 2. Relevant Closing Arguments

The prosecutor explained that, if the jury decided Randle committed murder, it then had to decide between first and second degree murder. The prosecutor stated: "That is also laid out in the jury instruction. There is verdict forms for each. The verdict forms you will see the first one says guilty or not guilty of murder. You check yes because I proved implied and express malice. [¶] Then you go to the second form. You then have to decide between first and second degree."

At the end of its closing arguments, the prosecutor asserted the evidence showed Randle committed first degree murder. The prosecutor continued: "There is also the lessers of involuntary manslaughter and manslaughter. Since the elements of murder are met, you vote guilty on murder and you stop there."

## B. Jury Instructions Did Not Affect Randle's Substantial Rights

Randle argues the jury was not properly instructed that the prosecution had to prove the killing was not done in a heat of passion to convict him of murder. The premise of Randle's claim is that CALCRIM No. 520—which did not contain the absence of heat of passion as an element of murder—combined with the prosecutor's statements that the jury could "check yes" on the murder verdict form after finding him guilty and "stop" after voting guilty on murder, improperly permitted the jury to find him guilty of murder without finding the absence of heat of passion beyond a reasonable doubt. Though Randle did not object to the jury instructions on this basis, "[i]nstructions regarding the elements of the crime affect the substantial rights of the defendant, thus requiring no objection for appellate review." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503; § 1259.)

30

" 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.) We therefore address the merits of Randle's claim only to determine whether his substantial rights were affected, and conclude they were not.

We review a claim of instructional error de novo, considering the challenged instruction " 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) " 'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.' " (*People v. Thomas* (2023) 14 Cal.5th 327, 382.)

We are not persuaded by Randle's contention that the jury instructions, even when considered in conjunction with the prosecutor's statements in closing arguments, affected his substantial rights by failing to properly instruct as to the elements of murder. Although CALCRIM No. 520 did not include absence of heat of passion as an element of murder, CALCRIM No. 570, which was read aloud to the jury along with CALCRIM No. 520, expressly told the jurors what Randle complains was missing by stating the prosecution had the burden of proving beyond a reasonable doubt he did not kill as the result of a sudden quarrel or in the heat of passion to convict him of murder. Thus, the instructions as a whole correctly informed the jury of the prosecution's burden of proof. (See *People v. Solomon* (2010) 49 Cal.4th 792, 822 [we consider entire charge of the court, not parts of an instruction or

31

any particular instruction, when determining correctness of jury instructions].)

*Thomas*, *supra*, 218 Cal.App.4th at pages 644–646 is instructive. In that case, the court found the failure to give the defendant's requested CALCRIM No. 570 instruction was error where the evidence was sufficient to place voluntary manslaughter due to sudden quarrel or heat of passion at issue in a murder trial. (*Id.* at pp. 645–646.) The court further stated that, though not requested by the defendant, "it also seems the jury should have been instructed under CALCRIM [No.] 522 that heat of passion could reduce the degree of murder." (*Id.* at p. 646.) Here, by contrast, the trial court gave both of those instructions to the jury.

We are also unpersuaded by Randle's assertion that, because CALCRIM No. 570 came after CALCRIM No. 520, the prosecutor's statements that the jury could "stop" and "check yes" after finding him guilty of murder prevented them from considering the prosecution's burden of proof as to murder in its totality. The court expressly told the jury to consider all the instructions together, that it could consider the verdict forms and different types of homicide in any order it wished, that nothing the attorneys said was evidence, and the jury instructions controlled over any conflicting comments by the attorneys.

We presume the jury understood, correlated, and followed the court's instructions (*People v. Thomas, supra,* 14 Cal.5th at p. 382), and Randle provides no convincing reason to doubt this presumption. (See *People v. Najera, supra,* 138 Cal.App.4th at p. 228 [rejecting argument that order of jury instructions led jury to convict without considering prosecution's burden to prove absence of sudden quarrel or heat of passion where trial court read

32

instructions in entirety to jury].)  Accordingly, the jury instructions did not affect Randle's substantial rights.

### C.  Prosecutorial Misconduct Claim Is Forfeited

Randle additionally argues the same statements by the prosecutor in closing argument misstated the law as to the elements of murder, constituting prosecutorial misconduct.

" '[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements [citation].' [Citation.]  Improper comments violate the federal Constitution when they constitute a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. [Citation.]  Improper comments falling short of this test nevertheless constitute misconduct under state law if they involve use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. [Citation.]  To establish misconduct, defendant need not show that the prosecutor acted in bad faith.  [Citation.]  However, [he] does need to 'show that, "[i]n the context of the whole argument and the instructions" [citation], there was "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." ' " (*People v. Cortez* (2016) 63 Cal.4th 101, 130.)

Randle's prosecutorial misconduct claim is forfeited because he failed to object on this basis below. (*People v. Perez* (2018) 4 Cal.5th 421, 450 [a defendant must object and request an admonition to avoid forfeiture of a claim of prosecutorial misconduct].)  Randle acknowledges as much but asserts the claim is nonetheless cognizable on appeal because it is

33

"inextricably intertwined" with his claim of instructional error, which he maintains affected his substantial rights.

As we have explained, Randle's instructional error argument fails on the merits and does not affect his substantial rights. (Part II.B., *ante*.) In any event, even if not forfeited, we would find Randle's claim of prosecutorial misconduct unavailing. The prosecutor's statements in closing argument that the jury could "stop" and "check yes" after finding him guilty of murder did not amount to either an egregious pattern of misconduct or involve the use of deceptive or reprehensible methods to attempt to persuade the jury regarding the burden of proof for murder. (*People v. Cortez, supra*, 63 Cal.4th at p. 130.) Rather, when viewed in the context of the whole argument and the jury instructions—which accurately instructed the jury as to the elements of murder and the prosecution's burden of proof—there is not a reasonable likelihood the jury improperly applied the prosecutor's comments. (*Ibid.*)

Randle alternatively contends defense counsel provided ineffective assistance for failing to object to the prosecutor's statements. As the prosecutor's statements did not amount to prosecutorial misconduct, Randle fails to show either that defense counsel was deficient for failing to object on this basis or resulting prejudice. (See *People v. Mai* (2013) 57 Cal.4th 986, 1009 [stating standard for demonstrating ineffective assistance of counsel].) Therefore, his claim of ineffective assistance is without merit.

Finally, Randle contends the cumulative effect of the above alleged errors prejudiced him, requiring reversal. As we have rejected all of Randle's claims, we reject this contention as well. (See *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

### DISPOSITION

The judgment is affirmed.

34

                                                        PETROU, J.

WE CONCUR:

FUJISAKI, Acting P. J.

RODRÍGUEZ, J.

A172507 / *People v. Randle*